# EXHIBIT B

**In the Regional Labor Court**
**Of Tel Aviv - Yafo (Bat Yam)**                              _____

**In the matter of:**          1.   **Cybereason Labs Ltd., Company Reg. No.**
                                    **514804251**
                               2.   **Cybereason Inc., 5186652, Delaware**

                               By their counsels Rami Landa and/or Hedvat Yanko
                               Wollman and/or Hadas Zigdon and/or et Ors.
                               Meitar Liquornik Geva Leshem Tal, & Co.
                               Advocates
                               Of 16 Abba Hillel Silver Rd., Ramat Gan 5250608;
                               Tel.: 03-6103100; Fax: 03-6103111

                                                          **The Applicants**;

                    **-Versus-**

                    **Yonatan (Yonni) Yossef Shelmerdine, ID. No.**
                    **209609676**
                    **3 270 St. (apt. 609), Cambridge (Massachusetts),**
                    **United States**

                                                          **The Respondent**;

# Urgent motion for temporary and interim reliefs
## (ex parte)

The Honorable Court is hereby requested by the Applicants, Cybereason Labs and
Cybereason Inc. (hereinafter collectively: the "**Company**") to exercise its power pursuant
to Regulation 129(1) of the Labor Court Regulations (Procedures) 5752-1991 and
Regulation 363(a) of the Civil Procedure Regulations 5744-1984 (hereinafter collectively:
the "**Civil Procedure Regulations**") and to grant the following reliefs as requested
hereunder, in light of the urgency of this case:

1.    To issue an interim injunction, <u>ex parte</u>, prohibiting the employee, Mr. Yonatan
      Yossef Shelmerdine ("**Mr. Shelmerdine**"), who terminated his employment in the
      Company on April 10, 2020, as a very senior product manager, and who was exposed

to the most sensitive commercial secrets of the Company from working during the period his non-compete clause is in effect, as stated hereunder, in SentinelOne Company ("**SentinelOne**"), since in the event Mr. Shelmerdine starts working for SentinelOne, this will inevitably result in the disclosure of the secret information and the trade secrets of the Company until the Honorable Court decides in the motion for the temporary reliefs.

SentinelOne is  one of the  two direct and major competitors of the Company and there cannot be any dispute that within the framework of Mr. Shelmerdine's employment in SentinelOne the most confidential trade secrets of the Company will be disclosed to SentinelOne   and therefore the requested temporary relief that is sought might have only a theoretical value. **For that purpose,  to the extent that the Honorable Court is of the opinion that the Company should continue and incur the costs of Mr. Shelmerdine's salary, for a reasonable period and until otherwise decided, the Company is willing to act in the said manner for the purpose of assuring the issuance of the interim injunction**. This will strike a balance between the interests of the parties under the circumstances of the case.

2.   The Honorable Court is requested to grant the following <u>temporary</u> reliefs:

(a)   An injunction instructing to render the interim injunction as said into a temporary injunction.

(b)   A temporary injunction prohibiting Mr. Shelmerdine to use, disclose, expose, communicate or transfer all or part of the confidential information and the trade secrets of the Company, as stated in this motion hereunder, or perform any action or use in connection therewith of any kind, and all whether directly or indirectly, whether or not in return for consideration;

(c)   A temporary declaratory injunction stating as clearly as possible that Mr. Shelmerdine is prohibited from disclosing any or all of the confidential information and the trade secrets of the Company and make any use thereof of any kind in SentinelOne or in any other company.

(d)   A temporary injunction prohibiting Mr. Shelmerdine to contact the clients of the Company on behalf of SentinelOne or on behalf of any other party and solicit them to move to  them, whether directly or indirectly, and an interim injunction prohibiting Mr. Shelmerdine to assist SentinelOne in any manner, in the competition over new and potential transactions and clients and for which the Company also competes.

(e)   A temporary injunction prohibiting Mr. Shelmerdine to solicit, whether directly or indirectly, employees and suppliers of the Company to work with SentinelOne, in the manner that Mr. Shelmerdine already tried even before he announced his resignation from the Company;

(f)   An injunction ordering Mr. Shelmerdine to return to the possession of the Company any confidential commercial information and/or any other trade secret owned by the Company and that is in his possession and/or under his control, and any copy thereof, to the extent that there is any, and order Mr. Shelmerdine to sign an affidavit stating that he fulfilled the said undertaking;

(g)   To grant any other temporary relief that the Honorable Court deems proper and just under the circumstances of the case.

3.   In addition, the Honorable Court is requested to order that a hearing of this motion will be held **at the earliest opportunity** in light of the fact that Mr. Shelmerdine terminated his employment in the Company on April 10, 2020 and, to the best of knowledge of the Company, he is about to start his employment in SentinelOne at the earliest opportunity. It is clarified that the Motion is filed at this stage since Mr. Shelmerdine was afforded a sufficient period of time to reply to the notices before legal action that were delivered to him, while taking into consideration the fact that the holiday of Passover was celebrated during this period.

To the extent that it is impossible to hold an urgent hearing of the Motion, the Honorable Court is requested, also for this reason, to grant the temporary relief that is requested ex parte, until a decision is made in the motion for the temporary reliefs.

4.   The Company will file its primary Statement of Claim according to the decision made by the Honorable Court in the motion for the temporary reliefs, pursuant to its authorities under Regulation 363(a) of the Civil Procedure Regulations 5744-1984.

The following are the reasons of the Motion:

## A.   <u>Foreword</u>

1.   The proceeding in question concerns the intention of a highly senior employee of the Company – who was exposed, by virtue of his position and the enhanced fiduciary duties imposed on him, to the entire trade secrets and the entire highly confidential, sensitive and protected information of the Company (the "**Confidential**

**Information**") – to start working for  one of the two direct and major competitors of the Company in a position that is substantially identical or similar to his position and all in contradiction to the express undertakings made in his employment contract and not to compete with the Company after the termination of his employment in the Company, in accordance with the provisions set forth in the Commercial Torts Law 5759-1999 and the enhanced fiduciary duties and the duty of good faith the Respondent owes to the Company by virtue of his senior position.

2.  Mr. Shelmerdine concentrated critical and sensitive information including the R&D of the products of the Company, and in this regard, Mr. Shelmerdine formulated and executed the products portfolio development plan of the Company and the roadmap of the Company for the upcoming years.

   **In this framework Mr. Shelmerdine was exposed, together with a very small and selected group of employees in the Company, to a groundbreaking idea in the sphere of activity of the Company, including a product that is already in its development stages, and that will constitute a groundbreaking and revolutionary idea, which is actually unprecedented in its field. Once this idea realized, the Company is expected to become a leading company in its field and will have a significant advantage over its competitors, including with relation to SentinelOne (the "Revolutionary Development").**

   **Due to the importance and the confidential nature of the Revolutionary Development, the Company even selected a small team of developers (less than 10) to work on this Revolutionary Development and Mr. Shelmerdine was selected as the employee who would be in charge of the development process of this product, which is expected to be released in the market approximately one year from today.**

   **Even Mr. Shelmerdine was of the opinion that this was a revolutionary development that should be kept in secret, as seen, *inter alia*, in the communications exchanged with him on the subject, and therefore Mr. Shelmerdine will not be able to deny this in any manner.**

3.  In order to understand the dramatic impact of the disclosure of the Confidential Information to SentinelOne and its impact on the Company, it is important to understand that the success of start-up companies does not happen in a void. Most of the start-up companies fail and the investment in such companies is lost. The companies that do succeed do so, first and foremost, **in light of their original**

**thought and innovation** compared to their competitors, and later on by their ability to translate these aspects to a product and a service **that are no less than excellent**.

4.   The CEO of SentinelOne holds the same view, and expressed this view in an interview he gave to Globes Newspaper in last June when he said that: "**Cyber security companies must innovate in order to stay relevant**."

5.    Therefore, the Company, that works at present on the development of the Revolutionary Development, could not have settled and could not have agreed that an employee, who took a full and active part in the Revolutionary Development including all its stages, who supervised this Revolutionary Development and who is thoroughly familiar with this Revolutionary Development, would move to work to its major and direct competitor, would use this information (there is no real way of avoiding this) and in this manner would deny from it the expected technological supremacy that the Company would gain, and in which the Company made considerable investments.

6.   And it should be emphasized – there is no realistic way in which Mr. Shelmerdine will be able to fill his position in SentinelOne without using the confidential information of the Company and the Company has no doubt that this information served as leverage in the negotiations about the very generous terms of employment that SentinelOne offered Mr. Shelmerdine. It is clarified that Mr. Shelmerdine informed the Company that SentinelOne intended "to fight over him" and that SentinelOne undertook towards Mr. Shelmerdine to incur the legal expenses that would be required following proceeding that the Company would commence in his case, and all in complete contradiction to the declared policy of SentinelOne, namely not to hire employees who are restricted by non-compete clauses in their contracts, according to information that the Company gained in the past, including from recent times. There is and there cannot be any other explanation that can account for the change of policy of SentinelOne for the purpose of this matter, except for its wish to receive confidential information relating, *inter alia*, to the said Revolutionary Development.

7.   And it is clarified – the Company is not interested to harm the free competition in the market however at the same time, the transition of a senior product manager to one of the two direct and major competitors of the Company, when the said employee holds its most sensitive and confidential information, is an irregular and uncustomary action that should not be allowed.

8.    Not only that such an action is unfair or improper on a theoretical level, but such an action can cause irreparable and irreversible damage to the Company and give to SentinelOne an unfair and unprecedented advertising for SentinelOne, to say the least. **And we shall say the following – there is no way, human or other, that can prevent the disclosure of the trade secrets of the Company to SentinelOne**.

9.    We can not only learn about the certain use that the Respondent will make with the Confidential Information and the trade secrets of the Company not just by applying "common sense and reason" but also from the bad faith conduct of Mr. Shelmerdine that is manifested by the following actions, *inter alia*:

   (a)   The fact that Mr. Shelmerdine actually chose to work in one of the two major competitors of the Company, in a competitive market, that is desperate for employees and in which he could work in his profession and in his field of expertise with dozens of others of companies, without breaching his non-compete undertaking and his undertaking regarding protection of the Confidential Information;

   (b)   Mr. Shelmerdine chose the time of his resignation, when Mr. Shelmerdine could have actually used the unlimited time he had to work in a company other than the major competitor of the Company;

   (c)   The fact that Mr. Shelmerdine conducted negotiations (which were probably lengthy) with SentinelOne behind the back of the Company, without informing the Company as required, and when this entire time he continued to be exposed to the Confidential Information of the Company first and foremost the Revolutionary Development that Mr. Shelmerdine knew of and continued to promote its development;

   (d)   The fact that Mr. Shelmerdine was trying to solicit at least one employee of the Company to move and work for SentinelOne, behalf the back of the Company and even before he informed the Company about his resignation.

   (e)   The fact that Mr. Shelmerdine announced his resignation on the same day he received a bonus in the amount of NIS 80,000.

10.   In light of the importance of the confidential information, and first and foremost the Revolutionary Development, shortly after his resignation many senior representatives of the Company held many conversations with Mr. Shelmerdine. In these conversations they offered him a series of generous and fair offers <u>that would</u>

have stricken a clear balance between the interest of Mr. Shelmerdine to terminate his employment in the Company and the interest of the Company to protect its trade secrets:

The first, immediate appointment for the position in VP Level for a trial period, when the Company agreed to equalize Mr. Shelmerdine's terms of employment according to the very generous terms of employment offered to him by SentinelOne, in addition to a bundle of options for a particularly high value

The second, special consideration in the amount of approximately NIS 240,000. This amount equals four additional salaries when during this period the Company undertook that it would assist Mr. Shelmerdine to find work in a cyber company that is not a direct competitor of the Company.

11. Mr. Shelmerdine refused to these two generous offers as said, without providing any reasonable explanation. However, contrary to the judgment that was given in the **Playtika Case**, then the Honorable Court can enforce the non-compete and non-disclosure clause in Mr. Shelmerdine's employment contract based on the second offer as said. In any event, the Company allocated to Mr. Shelmerdine options worth tens of thousands of dollars and whose exercising is stipulated on the express prohibition to move and work for another company, and these also constitute sufficient "special consideration."

12. We can also learn about the fact that Mr. Shelmerdine's employment in SentinelOne is improper from the simple fact that only about a month ago SentinelOne stipulated the employment of another employee who was dismissed from the Company and whose employment contract also includes a non-compete clause on the approval of the Company. The fact that SentinelOne did not act in the same manner also with respect to Mr. Shelmerdine is therefore conspicuous and proves that the employment of Mr. Shelmerdine is so important and so substantial to SentinelOne (in light of the Confidential Information of the Company that Mr. Shelmerdine holds) to such degree that it was willing to employ Mr. Shelmerdine even while grossly violating his undertakings. We can also reach this conclusion from the fact that SentinelOne undertook towards Mr. Shelmerdine to incur the legal costs, to the extent required, to the extent that the Company would commence legal action against him for the purpose of enforcing his obligations.

Therefore, On April 8, 2020 the Company sent Mr. Shelmerdine notices before legal action in which Mr. Shelmerdine was required to fulfill his entire undertakings in accordance with his employment contract and in accordance with any other law,

including his undertaking not to work for a company that is in competition with the Company.

13.   In light of the fact that the holiday of Passover was celebrated, Mr. Shelmerdine afforded a period of time to answer this letter until April 17, 2020.

14.   Upon reading Mr. Shelmerdine's response we can find a state of affairs that is even more problematic than the arguments presented above since not only that Mr. Shelmerdine denied in his response his obligations as said, argued that he did not have any confidential information of the Company, that his position was not even a senior position and that he was bound by enhanced fiduciary duties, but Mr. Shelmerdine even besmirched the Company and argued that he resigned from the Company in light of the bad atmosphere (in that manner!) in the Company and its defective management, and even threatened he would commence legal action against the Company, and all while using an aggressive and threatening tone – that attests to the real and immediate risk of the use of the confidential information of SentinelOne by the Company.

15.   Even the balance of convenience leans clearly in favor of the Company, since Mr. Shelmerdine did not yet start his employment in SentinelOne, in light of the enormous damages (direct and indirect) that will be caused to the Company but for the enforcement of the non-compete clause and for which no reparation will be sufficient. In addition, and to the extent that the Honorable Court is of the opinion that this is necessary, the Company will incur the employment costs of Mr. Shelmerdine in the Company for a reasonable period, and until otherwise decided by the Honorable Court. This is an offer that strikes the fairest and the most appropriate balance between the interests of Mr. Shelmerdine and the Company, and that justifies the issuance of the interim injunction ex parte requested in the first part of this Motion. .

16.   For the purpose of obtaining the reliefs listed in the first paragraph of this Motion, the Company will prove in the Motion that:

(a)   The Company and SentinelOne are competing companies (see Chapter B of the Motion);

(b)   The Company possesses important Confidential Information, including the Revolutionary Development, and the Company invests substantial resources in its protection, and to the extent that Mr. Shelmerdine moves to SentinelOne he

will definitely use the Confidential Information of the Company (see Chapter C of the Motion);

    (c)   His resignation for the purpose of moving to the major and direct competitor of the Company, and the special consideration that Mr. Shelmerdine received from the Company require that the Honorable Court will grant the sought reliefs (see Chapter D of the Motion);

    (d)   Mr. Shelmerdine's employment contract, as well as the provisions of the Commercial Torts Law and the fiduciary duties and the duty of good faith (all the more so the enhanced fiduciary duties and the duty of good faith imposed on him as in light of his senior position) justify the granting of the sought reliefs (see Chapter E hereunder);

    (e)   The balance of convenience clearly leans in favor of the granting of the Motion including its entire reliefs (see Chapter F hereunder).

17.   In light of the foregoing, and as stated in the Motion, the Honorable Court is requested to order as requested in the first part of this Motion.

## B.   The parties to the Motion and the competition between the companies

18.   The Company is a private start-up company that engages in the field of cyber security and the provision of response and security solutions for endpoints[1]. The Company specializes in the development of security platforms that allow organizations to supervise continuously the different systems for the purpose of searching, analyzing and preventing advanced cyber-attacks. The products of the Company include the supply of customized software and auxiliary services (that assist the clients of the Company to manage the software, analyze and stop the attacks).

19.   The Company was founded by three Israeli founders with unique background and know-how in the field of information security and it conducts its global operations by two principal arms – an Israeli company (Cybereason Labs Ltd.) that performs, by approximately 200 employees, the research and development work, and a U.S. company (Cybereason Inc.) where the headquarters of the Company are located that

---

[1] Endpoint security includes tools applied for the purpose of protecting the business network of the organization when accessed from remote devices, wireless or mobile, such as laptops, tablets and mobile phones

performs, by approximately 200 employees, the management of the Company, including the management of the development, marketing, sales and operation works. The Company, including its two arms as said, was founded in July 2012 and employs at present approximately 550 employees. The Company has branches in London, Japan and South Africa. The Company has experienced rapid development stages and in the last year recruited approximately 100 employees in total around the world.

20.   **Mr. Shelmerdine** was employed in the Company as of January 22, 2017, according to an employment contract dated January 10, 2017 (the "**Employment Contract**").

➤   A copy of the Employment Contract is attached to the Motion and marked as **Appendix 1**.

21.   First, Mr. Shelmerdine worked as a product manager from the development site of the Company in Israel. In February 2019 Mr. Shelmerdine relocated, <u>following his request</u>, *inter alia*, and after the Company invested extensive resources, to the United States, and in this framework, he was promoted to the sensitive and senior position of senior product manager. After a short while Mr. Shelmerdine was promoted again to the position of a product management director and became part of a very small circle of confidants in the Company, with all ensuing consequences.

22.   As part of his relocation to the United States, and after the Company performed with Mr. Shelmerdine a settling of accounts, on March 4, 2019 part of Mr. Shelmerdine's employment terms were changed, especially in anything related to his terms of his wages, while the parties stated expressly that the existing terms of employment (and as stated in the employment contract) remained unchanged. Therefore, the undertakings of Mr. Shelmerdine, *inter alia*, regarding protection of confidentiality and non-competition are still in effect

➤   A copy of the letters regarding Mr. Shelmerdine's relocation to the United States is attached to the Motion and marked as **Appendix 2**.

23.   SentinelOne is also a private Israeli start-up company that engages in the same sphere of activity of the Company. SentinelOne, the Company in which Mr. Shelmerdine intends to start working, provides security solutions to endpoints. SentinelOne was founded in 2013 (a short time after the foundation of the Company) also by two Israeli citizens, and its operations, same as the Company, are also conducted from Israel (the development center) and from the United States (marketing, sales and operation).

➤     A copy of the relevant page from the internet website of SentinelOne is attached to the Motion and marked as **Appendix 3**.

24.     Not only that the Company and SentinelOne have a similar "Israeli" structure, but both market similar products  that are intended to solve the same problems in the same market segment of clients (large clients) by a similar technology. As proof of the said, the two companies compete over any new transaction and client together with CrowdStrike Company.

25.     We can learn about the fact that these are competing companies from the fact that it was only approximately three weeks ago (on March 31, 2020) that <u>SentinelOne stipulated the employment of an employee who was dismissed from the Company with the approval of the Company, and this is seen in the words written by that said former employee of the Company and as follows:</u>

> "As I shared I did received a verbal offer from SentinelOne
> <u>on the condition there was no legal issues or non-compete</u>
> <u>aspects from Cybereason</u>%1

➤     A copy of an email dated March 31, 2020 is attached to  the Motion and marked as **Appendix 4**.

26.     Regretfully, not only that SentinelOne did not act in the same manner with respect to Mr. Shelmerdine, however, according to Mr. Shelmerdine's argument, it even undertook to "fight for him" and incur the legal costs, to the extent that the Company commenced legal action against him.

27.     The conduct of Mr. Shelmerdine and SentinelOne causes significant concern under the circumstances of the case with respect to the purpose of Mr. Shelmerdine's employment and the clear and joint intention of the parties, which in any event is inevitable, to use the trade secrets and the confidential information of the Company, and all as stated in Chapter C(2) hereunder.

## C.     <u>The Company has Confidential Information that Mr. Shelmerdine will inevitably use if his employment in SentinelOne is permitted</u>

28.     In this chapter we shall elaborate on each of the fields of practice that Mr. Shelmerdine engaged in, we will elaborate on the Confidential Information and the trade secrets of the Company to which Mr. Shelmerdine was exposed in each of these

areas, the enormous advantage that SentinelOne would gain if it obtains such secrets, the actions that the Company performs for the purpose of protecting the Confidential Information in strict confidence, and the enormous and irreparable damages caused the Company as a result of such actions (see Chapter C(1) hereunder).

29.  In addition, we will see that not only that there is no other alternative but to use the Confidential Information and the trade secrets of the Company by SentinelOne, however in light of the logic of things this is the purpose of Mr. Shelmerdine's employment in SentinelOne (see Chapter C(2) hereunder).

## C(1).  **The highly protected trade secrets of the Company to which Mr. Shelmerdine was exposed**

30.  Mr. Shelmerdine served in the Company a very unique and sensitive position in which he concentrated the most sensitive information about the Company. Mr. Shelmerdine had in his possession Confidential Information that was not related to one narrow aspect, but to a number of cardinal and important aspects that were necessary and highly critical for the success of the Company in general and vis-à-vis its competitors in particular.

31.  And so, Mr. Shelmerdine concentrated highly critical and sensitive information in the R&D of the product, in marketing and sales, and was exposed to the entire Confidential Information relating to the clients, including their needs, requirements and the terms engagement with such clients.

32.  The Company had special trust in Mr. Shelmerdine and therefore not only that the Company revealed to Mr. Shelmerdine, **together with a group of very few selected and senior employees** the Revolutionary Development, and even allowed Mr. Shelmerdine to manage closely its development, thereby becoming exposed to the manner of performance, the performance stages and the plans of the Company regarding the Revolutionary Development.

33.  Mr. Shelmerdine engaged in the management of the Revolutionary Development even in the months that preceded his resignation, during which he continued to be exposed to additional and material information and all while at the same time he conducted negotiations (probably lengthy negotiations) with SentinelOne – the major and direct competitor of the Company.

34.  The development itself that, contrary to customary practice, is developed by a small and selected  team of developers (less than 10 employees) is also intended to protect

its confidentiality also if this causes a "delay" in the dates in which the Company will launch the product in the market.

35.   **The product in question is a revolutionary product, when the Company worked on its development for approximately two years, and the product is supposed to be launched in the market in approximately one year as of today, when the said product is intended to change radically the cyber market in the sphere of activity of the Company and assure the dominance of the Company over its competitors over a long period of time. This matter is undisputed, also in light of the fact that this is seen in the clear statements that Mr. Shelmerdine wrote to the Company for the purpose of this matter.**

And now, an investment of years would be completely lost from the time that Mr. Shelmerdine discloses to SentinelOne the Revolutionary Development (and the Company hopes that Mr. Shelmerdine did not already disclose it). If this happens, SentinelOne will not be able to ignore it, it will accept this Revolutionary Development and will try to be the first, at the expense of the Company, that uses this Revolutionary Development or use it for any other purpose for its own benefit.

36.   As said, one of the fundamental principles in the success of start-up companies is their ability to be innovative and to present this innovation to the market before their competitors and in a significant gap, and for that purpose they recruit the best minds and invest the best efforts for tens and hundreds of millions of dollars a year (same as the Company). The CEO of SentinelOne also referred to this issue, and his statements were cited in the first part of this Motion (section 4, above).

   ➤   A copy of an article from Globes newspaper is attached to the Motion and marked as **Appendix 5**.

37.   **Therefore, the Honorable Court is requested to protect the rights of the Company and endeavor to the best of its ability to prevent the use of the Revolutionary Development including all its aspects by Mr. Shelmerdine, SentinelOne and any other competing company**.

38.   In addition to the Revolutionary Development, Mr. Shelmerdine holds additional, secret and critical information that **includes the following, *inter alia***:

   (a)   Absolute knowledge about the vulnerabilities of the Company <u>in each of the major areas in which the Company engages</u>;

    (b)   Full knowledge about the requirements of the clients, the products customized to these clients, the terms of engagement with these clients and the "vulnerabilities" in the contracts that the Company made with its clients.

**If there is any information that is priceless for a competing company – all the more so a direct and major competitor of the Company – when Mr. Shelmerdine holds this entire high quality Confidential Information in his possession, as proven hereunder, information that is the property of the Company.**

39.   <u>Mr. Shelmerdine guided, led and supervised the work of the R&D department in Israel</u> – which creates an important value and advantage for the Company over its competitors. In fact, Mr. Shelmerdine was involved in the design and the implementation of all the different stages in the life cycle of the present and future products of the Company.

40.   Naturally, Mr. Shelmerdine's involvement in the inner workings of the existing products <u>exposed him to the vulnerabilities of these products</u> in the highest detail, both with respect to the performance of the products of the Company and from a technological aspect, including the product algorithms.

41.   In that manner, for example, if the Company wishes to market its products it must obtain a "standard mark" from an independent third-party. Mr. Shelmerdine, by virtue of his position, led and managed this activity vis-à-vis an external company – NSS Company. As part of his work with NSS Company, Mr. Shelmerdine was exposed to the entire vulnerabilities of the products, the gaps, weaknesses and the information relating to the technical improvements that were performed or that should be performed in the products.

42.   In addition, and only the purpose of illustrating the involvement of Mr. Shelmerdine in the development of the existing products of the Company it is clarified that based on the knowledge of the vulnerabilities in the products of the Company, Mr. Shelmerdine set out for the development team the priorities in handling these vulnerabilities (a matter of critical importance), set the schedules, regulated the loads and supervised the performance of his instructions.

43.   This is information that <u>has additional critical importance to SentinelOne,</u> from the time that SentinelOne comes to develop and market its products it will highlight and emphasize the disadvantages in the existing product of the Company vis-à-vis the existing clients of the Company or the potential clients of the Company. In this

manner SentinelOne will gain an unfair and unprecedented advantage, all the more so when such information is provided by a former senior employee of the Company, this will have further importance. This will cause critical harm to the Company's ability to compete in the market.

44.  <u>Mr. Shelmerdine took an active part in the relationship that the Company maintained with its existing and potential clients</u> – Mr. Shelmerdine also maintained a tight connection with the clients of the Company (and its largest clients) and also took an active part in the recruitment of new clients, from the time Mr. Shelmerdine presented to them the technological performance and specifications of the products and the services of the Company. In this framework Mr. Shelmerdine also used to highlight the strengths of the products of the Company compared to its competitors, including compared to those of SentinelOne (based on the information in the public domain existing about SentinelOne). **This is highly valuable information that affects the sales of the products of the Company**.

45.  Mr. Shelmerdine even trained the other salespersons in the Company, including with respect to the technological and the "product" strategy, and in particular with respect to the vision of the Company and the future significant steps that would be taken for the purpose of attaining this vision.

46.  As part of his involvement in the engagement with the clients of the Company, Mr. Shelmerdine was first and foremost exposed to their requirements (a process that takes time) and the products that were customized to these clients, the terms of engagement with these clients (costing, discounts etc.) however, and most importantly, the vulnerabilities of their engagement with the Company.

47.  This is inside information that constitutes a trade secret of the Company, as stated by the National Labor Court in the **Data Pool Case**:

> "For the purpose of this matter we accept the argument of Data, namely that even if the names of its clients – in and of themselves – are not classified materials, then the particulars contained in the list of clients about each of the clients, including the information about his requirements, the types of the products that the client needs, the scope of purchases and the price paid for each of the items, render this information a "trade secret"[2]

---

[2] LA (National) 80-08 Data Pool Ltd. v. Yaniv Technologies Media Ltd. (Nevo, 7/10/10).

48.  These things gain further importance taking into consideration the fact that the transition of clients from one company to the next in the market is not a complicated thing, and therefore the use of each of the items of information with respect <u>to the existing clients of the Company</u> will help SentinelOne, in an outrageously easy and unfair manner, to use this information and exploit it for the purpose of providing services to more clients of the Company thereby causing serious harm to the revenues and the reputation of the Company.

49.  Understandably, the said information can be used also in anything related to the engagement with <u>new clients</u> – a critical fact where **the companies compete over the same big clients in almost any new potential transaction**.

50.  In light of the foregoing, then Mr. Shelmerdine possesses Confidential Information and trade secrets of the Company (defined as **"Confidential Information"**) and the Company applies a series of measures for the purpose of protecting such information, *inter alia*, as follows:

   (a)  The Company does not grant to the employees –  whose position requires exposure to sensitive and confidential information – access to  this information without signing non-compete agreements and Non-Disclosure Agreements (employment documents and/or NDA). The Company would not have employed Mr. Shelmerdine, and certainly would not have exposed Mr. Shelmerdine to the Confidential Information (all the more so in the full scope to which Mr. Shelmerdine was exposed to the Confidential Information) but for Mr. Shelmerdine's signing on his undertaking to protect the information and not to compete with the Company for a period of 12 months after termination of his employment in the Company.

   (b)  The Company classifies the Confidential Information in its systems and grants access to the information according to different permission levels and based on the trust the Company has in the employee and in his position. <u>Mr. Shelmerdine,  being a highly senior  product manager,  should have had access to information relating to R&D and sales</u>.

   (c)  The access to the database of the documents stored in the systems of the Company is granted only to specific employees while applying strict safety measures for the purpose of protecting the database.

   (d)  **Regarding the Revolutionary Development, not only that a very small group of senior employees was involved in the information regarding this**

**development however, contrary to the customary practice, a small and selected team is also involved in the development, and not the entire development team that includes many employees, and that works on the existing products of the Company. This has a direct impact on the delay of the launching date of the revolutionary product to the market – a "price" that the Company is willing to pay for the purpose of protecting the full confidentiality of the product at the time it is launched to the market**.

(e)     The Company also takes action for the purpose of protecting its trade secrets, *inter alia*, by the registration of patents in the most appropriate and necessary cases.

51.   **In light of the foregoing we can gain a clear impression and see that Mr. Shelmerdine holds in his possession highly confidential and sensitive secrets regarding the operations of the Company,  that gives to the Company its competitive advantage at present, and that will give to the Company an even more dramatic competitive advantage in approximately one year from today – and if Mr. Shelmerdine's employment in SentinelOne is allowed, this information will be inevitably exposed thereby denying from the Company the significant advantage that the Company had in the upcoming years.**

C(2)   <u>**Mr. Shelmerdine will definitely use the Confidential Information and the trade secrets of the Company within the framework of his employment in SentinelOne**</u>

52.   In light of the essence and the scope of the Confidential Information to which Mr. Shelmerdine was exposed, as well as the similar spheres of activity of the companies, it is clear that Mr. Shelmerdine will inevitably use this information in his work in a similar position in SentinelOne – which will give SentinelOne an unfair advantage and will cause enormous and irreparable damage to the Company.

53.   We can reach this necessary conclusion first and foremost  according to the logic of things and common sense, since it is inconceivable that Mr. Shelmerdine would keep a secret that might have a critical and direct effect on SentinelOne in approximately one year, when Mr. Shelmerdine intends to start working for SentinelOne and making progress in SentinelOne in the upcoming years.

54.   We can also reach a similar conclusion from also from a series of judgments that considered such issues. In that manner, for example, in the **Playtika Case** the Honorable Court considered the recruitment of an employee by a competing

company when the said employee possessed extensive information about the plans and the future strategy of the product. In that case the Honorable Court referred to the fact that the employee would have to use the said information within the framework of his employment in the competing company, and stated the following:

> "It is doubtful whether it is will possible to maintain this separation and protect the specific knowledge that was obtained with respect to the game Slotomania, as well as the future plans of the Applicant, from the time the Respondent starts working for Dragonfly. This is due to the existing resemblance between the games developed by the two companies."[3]

55.   The Honorable Court also made similar statements in the **Greenberg Case**, where the Honorable Court referred to the fact that the employee's wish to make progress and prove himself in a  competing company would inevitably cause that employee to use the confidential and material information obtained from his previous employer, as part of his employment in the competing company. The Honorable Court stated the following in that case:

> "In fact, even the Defendant agreed that the names of the clients and the rates were a trade secret that the employee was supposed to protect, according to his undertaking in the contract, however, according to his own words, even during his employment in the Defendant this information was not disclosed to the Defendant. We cannot rely on a statement and we should not accept circumstances in which the ordinary course of things is that the success of the Defendant in his employment in the Defendant, the desire to make progress and advance, will of course advance the business of the Defendant, and the disclosure of the names of clients, the rates and the work methods of the Plaintiff are definitely the means to reach a speedy and efficient advancement of the business of the Defendant in the courier business."[4]

56.   Even in the **DSP Case** the District Court issued an injunction that prohibited a former employee to work for the direct competitor, in light of the concern that the said

---

[3] LDHJ 2433-03-17 Playtika Ltd. v. Yaakov Gmar, (Nevo, 19/3/2017).
[4] CA 340/90 ***Brinks (Israel) v. Greenberg et Ors.***, PM 5751(1) 221, p. 224.

Case 1:20-mc-91192-WGY   Document 2-2   Filed 04/27/20   Page 20 of 56

19


employee who was exposed to confidential commercial information relating, *inter alia*, <u>to the vulnerabilities in the product</u>, would inevitably use such information in a manner that would harm the company. The court stated the following in that case:

> "I.C.Com is a company that engages in direct competition with the Applicants and that engages in the development of Dsp Cores that compete with the Cores of the Applicants and that are designated to perform the same actions for the same market, the same technological segment and the same sector of clients.
>
> The concern of the Applicants stems from t possible use of I.C.Com might make in the know-how that Ms. Gross gained for the purpose of engaging in competition in the specific market of the two companies, for the purpose of replacing the products of the Applicants.
>
> <u>In light of these circumstances, when there is no practical possibility to execute a Delete command that will delete any sign of the secrets that Ms. Gross keeps in her brain, there is in fact, no other alternative but to issue an injunction that will prohibit I.C.Com to employ Ms. Gross, for the purpose of assuring and enforcing the performance of the duty of confidentiality</u>. Even if basic technological approach of the two signal processors is completely different, and it is not possible to transfer specific solutions from one processor to the next, <u>then it is clear that the know-how to which Ms. Gross was exposed during the term of her employment in the Applicants, and that also includes information regarding the type of the clients, their requirements and the disadvantages in the processor manufactured by the Applicants, might be used by Ms. Gross in her new workplace and cause considerable harm to her previous employer</u>."[5]

57.   And if the aforesaid does not suffice, there is a series of other circumstances that prove that not only that Mr. Shelmerdine will **inevitably** breach his undertakings and will use the trade secrets of the Company while he is employed by SentinelOne,

---

[5] CA 294/97 ***DSP Group Inc. v. I.C.Com Ltd***., DCR 1997(3), (24/07/1997).

however it is clear that this is the purpose of employment of Mr. Shelmerdine in SentinelOne, and as stated hereunder:

(a)   Mr. Shelmerdine resigned from the Company, after he conducted secretly and behind the Company's back for many weeks in which he interviewed and conducted negotiations with SentinelOne. During this entire time Mr. Shelmerdine  continued to manage the development of the revolutionary product and was exposed to the other trade secrets of the Company. The court stated, in the **Trendline Case,** that such conduct was a fundamentally improper conduct:

> "There is no doubt that each employee is entitled to find for himself a proper workplace and there is nothing wrong in conducting negotiations during the term of his employment. However, in this case these are negotiations that were conducted between the Respondent and a company that was in competition with the Applicant, in respect of which the Respondent had clear knowledge that he was prohibited from being employed in that company. In light of the said, then the improper thing is not the negotiations that an employee conducts with a potential employer during the term of employment, however it is conducting negotiations with a competing company for the same position and after providing an undertaking not to act in the said manner, and this is the improper aspect in such conduct and this is the decisive element."[6]

And see also: LDHJ (Tel Aviv) 22487-11-17 ***Dor-Alon Gas Technologies Ltd. v. Ze'ev Golan*** (Nevo, 14/12/2017).

(b)   The fact that Mr. Shelmerdine actually chose the major and direct competitor of the Company, and not   tens of others potential companies, speaks for itself. Mr. Shelmerdine gained the know-how and the occupational experience that allows him to work in  tens of other companies that engage in the field of cyber security in general  (except for companies engaged in endpoint security) in a market that is desperate for employees in particular. Therefore, the decision that Mr. Shelmerdine made, namely to become an employee in one of the two main and direct competitors of the Company, a company that the Company

---

[6] LD (Tel Aviv) 44990-11-10 ***Trendline Information and Communication Services Ltd. v. Moshe Yechezkel***, (Nevo, 7/10/2020) (the **"Trendline Case"**)

"meets" while competing for the same deals with its clients, is no coincidence, its purpose is clear and it constitutes a gross violation of a clear contractual undertaking that Mr. Shelmerdine made, as a result breach of his enhanced fiduciary duties and the duty of good faith Mr. Shelmerdine owes to the Company.

(c)     At the time Mr. Shelmerdine resigned, the Company  made him two generous and worthwhile offers, which he rejected firmly without providing any satisfactory explanation: **the first**, the immediate appointment for the position of VP  Level (for a trial period) – a position that Mr. Shelmerdine coveted during his employment in the Company. This is a senior executive position in which Mr. Shelmerdine would improve considerably his terms of employment and according to the terms he was offered in SentinelOne, according to his argument.; **the second**, special consideration in the amount of approximately NIS 240,000 (i.e., payment of 4 additional salaries) and an undertaking from the Company to assist Mr. Shelmerdine in finding work in a company that is not a direct competitor of the Company. Mr. Shelmerdine rejected these two generous offers as said, without providing any plausible explanation.

(d)     Mr. Shelmerdine's attempt to solicit, in the least, an employee in the product development department in the Company to move with him to SentinelOne, even before he announced about his resignation from the Company. This fact proves that Mr. Shelmerdine does not hesitate to breach express undertakings towards the Company[7] and harm the Company and that he is determined to prove himself to SentinelOne, including by the exposure of the confidential information of the Company.

(e)     Ordinarily, and when dealing with employees that  are not exposed to valuable confidential information of a competing company, SentinelOne is in the habit of honoring non-compete clauses of its prospective employees, as stated in detail in section 25 above.  The fact that SentinelOne did not act in the same manner towards Mr. Shelmerdine, and the declarations of Mr. Shelmerdine, namely that SentinelOne was willing to "fight over him" and, if necessary, to incur the legal costs that are required for the purpose his employment, is a clear warning regarding the purpose of the engagement between the parties.

---

[7] Within the framework of Mr. Shelmerdine's Employment Contract, he undertook not to solicit employees and/or clients and/or suppliers of the Company during the term of his employment, and even 12 months after termination of employer-employee relationship (section 12.1.1 of the employment contract).

(f)   Mr. Shelmerdine did not see fit to honor his non-compete clause in his Employment Contract in general and in light of the information contained above in particular, and therefore we should doubt, to say the least, his wish or intention to protect the trade secrets and the Confidential Information of the Company, even if this could be done and, as said, the Company thought that this was inevitable.

We can reach this necessary conclusion not only from the total evasion of Mr. Shelmerdine from the fulfillment of his obligations as said, but also from his argument that he does not have in his possession confidential information of the Company and his aggressive threats to commence legal action against the Company if the Company insists on his rights for the purpose of this matter, as seen in the letter of reply that Mr. Shelmerdine delivered to the Company (Appendix 8 hereunder). The arguments and the tone that Mr. Shelmerdine uses, as seen in his letter, are very unsettling.

(g)   During the entire term of his employment in the Company Mr. Shelmerdine received a salary and terms of employment whose standard was higher compared to the other employees in the market and with relation to other employees and managers in the Company and also with relation to managers in his rank (the last salary Mr. Shelmerdine earned totaled an amount of approximately NIS 60,000 per month). Compared to these terms of employment, we find the extraordinary and unusual offer that was made by SentinelOne, an offer that is unusual and extraordinary both with relation to the position and in light of the education and experience of Mr. Shelmerdine – an offer that includes a signing bonus in the amount of approximately NIS 125,000, in addition a generous monthly salary (approximately NIS 70,000) and an annual bonus in the amount of approximately NIS 200,000, and probably also the allocation of considerable options whose scope remains unclear. It is clear that these payments, that deviate from any reasonable amount, are not <u>an innocent improvement in Mr. Shelmerdine's terms of employment, but include a special consideration for the disclosure of the trade secrets of the Company</u>.

(h)   Mr. Shelmerdine resigned from the Company on the same day he received to his bank account a bonus in the amount of approximately NIS 80,000. The timing is no coincidence of course, and it can prove the flagrant, dishonest and deceitful conduct of Mr. Shelmerdine.

(i)     The Company learned that after Mr. Shelmerdine resigned, he started to besmirch the good name of the Company and the names of its managers. This conduct of Mr. Shelmerdine also proves that he abandoned the enhanced duties of good faith that applied to him and his bad faith and his intentions to breach his undertakings of confidentiality and non-competition.

58.     These circumstances as stated above prove, without a doubt, that Mr. Shelmerdine will use the Confidential Information of the Company during his employment in SentinelOne – and this requires the enforcement of the non-compete clause incorporated in his Employment Contract.

## D.     The resignation of Mr. Shelmerdine for the purpose moving to SentinelOne

59.     On  March 31, 2020, and  on the day he received to his bank account a bonus in the amount of approximately NIS 80,000, Mr. Shelmerdine  informed verbally his managers about his resignation from the Company (the **"Resignation"**). On April 3, 2020 Mr. Shelmerdine announced his resignation also in writing and also announced his intention to move and work for SentinelOne.

➤     A copy of Mr. Shelmerdine's official resignation notice is attached to the Motion and marked as **Appendix 6**.

60.     The Company was shocked when it learned about Mr. Shelmerdine's intention as said. However, in light of the actual concern about the exposure of the trade secrets of the Company to SentinelOne, first and foremost the information relating to the Revolutionary Development, a series of key employees in the Company endeavored to the best of their ability to prevent the termination of Mr. Shelmerdine's employment in the Company and his transition to SentinelOne. In that manner, for example, the CEO of the Company (who is a member of the Board of Directors), the Chief Technology Officer of the Company (who is a member of the Board of Directors and one of the founders of the Company, Mr. Roi Carmel (CSO and Product Manager of the Company), Mr. Ori Herman, the CEO in Israel and other officials talked to Mr. Shelmerdine in an attempt to dissuade him from moving to SentinelOne.

61.     As part of these conversations the Company made to Mr. Shelmerdine the two generous and worthy offers which we described in section 10 above, when the offer to incur his salary costs for a period of 4 months during which the Company would

help Mr. Shelmerdine to find work in a cyber company that is not in competition with the Company was a proper and fair solution that reflected the balance between Mr. Shelmerdine's aspiration to leave the Company and the aspiration of the Company to protect its trade secrets and mitigate its damage.

62. Mr. Shelmerdine rejected these two offers, in bad faith and for reasons that can be construed only as his intention to use the Confidential Information as part of his employment in SentinelOne, and Mr. Shelmerdine stated firmly that his decision to move to SentinelOne was final. Despite Mr. Shelmerdine's conduct, it should be noted that this is proper consideration, and even way beyond, that justifies the enforcement of Mr. Shelmerdine's undertaking regarding non-competition, and this is also seen in the statements made by the Honorable Court in the **Playtika Case**, to which we shall refer in Chapter E(4) hereunder.

63. In light of the said, on April 8, 2020 the Company delivered notice before legal action to Mr. Shelmerdine and to SentinelOne. In these letters Mr. Shelmerdine was required to notify the Company that he did not intend to become an employee of SentinelOne and/or in any other company that was in direct competition with the Company; to acknowledge before the Company that he did not remove or take any document that was related to the Company and/or its Confidential Information and that he did not communicate this information without permission to any third-party, including to SentinelOne; to return to the Company a copy from any item of Confidential Information in his possession, to the extent that he held such an item, and to confirm in writing that he did not keep any copy of the Confidential Information.

64. Despite the urgency, the Company allowed Mr. Shelmerdine to reply to the letter until April 17, 2020, due to the proximity of the times to the holiday of Passover.

   ➤ A copy of the letters of the Company to Mr. Shelmerdine and to SentinelOne dated April 8, 2020 is attached to the Motion and marked as **Appendix 7**.

   ➤ A copy of  Mr. Shelmerdine's reply letter dated April 17, 2020 is attached to the Motion and marks as **Appendix 8**.

65. The intensity of Mr. Shelmerdine's response and its content left no room for doubt regarding the purpose of the engagement between Mr. Shelmerdine and SentinelOne and the intention of the parties to use the confidential information of the Company.

(a)   And so, Mr. Shelmerdine reneged his obligations to keep in confidence the confidential information of the Company and observe the non-compete clause and argued that from the time he relocated to the United States his obligations for the purpose of this matter were invalid – an argument that is in complete and explicit contradiction to the letter of the Company dated March 4, 2019 (Appendix 3 above);

(b)   Likewise, Mr. Shelmerdine denied that he held any confidential information of the Company, and all in contradiction to the fact that he was involved in the Revolutionary Development and contrary to real time documents that Mr. Shelmerdine made, and that prove the opposite;

(c)   The fact that Mr. Shelmerdine decided to besmirch the name of the Company while using very offensive words regarding the corporate culture and the management of the Company ("toxic corporate culture") is not trivial and it shows the serious nature of his threat to harm the Company, even when such action is not necessary and such statements do not convey another meaning;

(d)   And, more than anything, in his letter Mr. Shelmerdine dedicates approximately 2.5 pages for the purpose of threatening the Company not to exercise its rights and protect its interests, while using aggressive language disguised as legitimate legal arguments. Again, this is an extraordinary behavior that attests to his determination to harm the Company.

66.   In light of the said, the Company was left with no other alternative, except for the filing of the Motion in question for the purpose of obtaining the urgent reliefs sought in the first part of this Motion.

### E.   The normative framework for the purpose of obtaining the sought reliefs

67.   In light of the foregoing we gain a clear impression of the fact according to which, *inter alia*, Mr. Shelmerdine was exposed to the most confidential secrets of the Company on the one hand, and these secrets will be clearly exposed to SentinelOne, the company where Mr. Shelmerdine will start his employment on the other hand.

68.   Therefore, the Company is entitled to the reliefs sought in the first part of this Motion, both in light of the express undertakings Mr. Shelmerdine made in his Employment Contract (Chapter E(1) hereunder); and in light of the provisions of the Commercial Torts Law and the rulings of the courts in connection therewith (Chapter E(2)

hereunder); both by virtue of the enhanced fiduciary duties and the duty of good faith imposed on Mr. Shelmerdine by virtue of industrial relations even termination of his employment in the Company (Chapter E(3) hereunder); and in light of the fact that Mr. Shelmerdine received a special consideration for such undertakings as said (Chapter E(4) hereunder).

### E(1).   Mr. Shelmerdine's Employment Contract obliges him to keep the secrets of the Company in confidence and avoid competition

69.   Within the framework of his Employment Contract (Appendix 2 above) Mr. Shelmerdine made a series of undertakings towards the Company, including:

(a)   To keep in strict confidence and while employer-employee relationship was in effect and even thereafter the entire Confidential Information of the Company (within its meaning in the Employment Contract) that reached his possession in the course of employer-employee relationship with the Company, and in this regard not to duplicate and/or communicate and/or publish or make any commercial use of the information (section 1 in Appendix B of the Employment Contract);

(b)   Not to work as an employee, consultant or in any other manner, whether directly or indirectly, in any corporation or any competing business engaged in the development, manufacturing or marketing of products that are similar or that are in competition with the products of the Company. This undertaking is in effect for a period of 12 months after termination of employer-employee relationship, unless the Company granted a different prior and written approval in connection therewith (section 12.1.2 of the Employment Contract);

(c)   Not to solicit clients, employees and suppliers of the Company whether directly or indirectly. This undertaking of the employee is in effect also for a period of 12 months after termination of employer-employee relationship (section 12.1.1 of the Employment Contract);

(d)   To provide to the Company, upon expiration of his term of employment, the entire intellectual property owned by the Company and all copies that were made in any form and that reached his knowledge/possession in the course of his employment (section 1 in Appendix B of the Employment Contract).

70.   For the purpose of this matter, and as part of his signing on the Employment Contract, Mr. Shelmerdine acknowledged expressly that the non-compete clause he undertook

to observe, was reasonable under the circumstances of the case, and in particular in light of the scope and the meaning of the secrets he was exposed to by virtue of his employment in the Company. This reasonableness can also be learned in light of the fact that Mr. Shelmerdine is familiar with the strategy of the Company for the upcoming years. section 12.2 of the Employment Contract states the following:

> ‰The Employee acknowledges that the restricted period of time under Sections 12.1 above are reasonable, in view of the nature of this position in the Company, the business in which the Company is engaged and Employee's knowledge of the Business.‰

71.   The purpose for which such undertakings were made is to protect the trade secrets and the intellectual property of the Company against illegal use by employees that have access to confidential information. There is no doubt that this is a legitimate interest that the Company should protect.

72.   And we shall remind, the undertakings that Mr. Shelmerdine made are part of the agreed terms of employment between Mr. Shelmerdine and the Company, and the terms of his employment and his rights were granted to him in return for the said undertakings. Furthermore, the said undertakings were a preliminary and necessary condition for his mere recruitment as an employee of the Company, and the Company was entitled to rely on them and based on them it was entitled to grant him access to its most sensitive and secret information.

73.   In light of the circumstances of the case, the undertaking that Mr. Shelmerdine made regarding non-competition is reasonable and proportionate also since the Mr. Shelmerdine's freedom of occupation was not harmed in any manner, and certainly in a disproportionate manner. Beyond the fact that Mr. Shelmerdine could have continued to work for the Company and chose to resign (despite the offers he received for his promotion) then his contractual undertakings prevent him, in practice, to go and work in a very limited number of companies and do not prevent from him to work in  tens of other companies in which he can fill positions that are suited to his skills.

74.   This fact is further reaffirmed in light of the fact that we are dealing with a market that is characterized by fierce competition, that is desperate for employees, and in which Mr. Shelmerdine should have no problem to find work. Solely for the avoidance of doubt it is clarified that the crisis that was caused as a result of the Coronavirus can affect this situation. On the contrary, according to the statements that were made by the director of the cyber plant of the Israel Aerospace Industries and the head of the team of cyber engineers on March 16, 2020, the crisis caused by

the Coronavirus caused a reality in which now, more than ever, hostile entities are trying to challenge and harm the systems of many employees who are required to work from home, and therefore the need and the demand for cyber products only increased.

➤ A copy of the article dated March 16, 2020 is attached to  the Motion and marked as **Appendix 9**.

## E(2).  <u>Misappropriation and unlawful use of a trade secret</u>

75. The Company does not object to competition, and as proof to the said, the Company did not enforce in the past the non-compete clauses of junior employees who went to work for other competing companies, including SentinelOne. Nevertheless, the Company is of the opinion that the transition that Mr. Shelmerdine made is violation of the fair rules of the competition, even according to the provisions set forth in the Commercial Torts Law 5759-1999.

76. Section 6 of the Commercial Torts Law 5759-1999, titled "Misappropriation of a trade secret" states the following:

> "(a) A person shall not misappropriate another's trade secret.
>
> (b) Any of the following acts constitutes a misappropriation of a trade secret:
>
> (1) The taking by illegal means of a trade secret without its owner's consent by applying improper measures <u>or the use of the secret by the person taking it</u>; for this purpose it shall make no difference whether the secret was taken from its owner or from another person in possession of the trade secret;
>
> (2) <u>Use of a trade secret without its owner's consent, the use being contrary to a contractual or fiduciary obligation imposed upon the user in favor of the owner of the secret;</u>

Section 5 of the Law defines a "trade secret" in the following manner:

> "Commercial information of every kind, which is not public knowledge or which cannot readily and legally be discovered by the public, the secrecy of which grants its owner an advantage over his competitors, provided that its owner takes reasonable steps to protect its secrecy;"

77. The contentions asserted by the Company as stated in Chapter C(1) above prove, without a doubt, that Mr. Shelmerdine holds a "trade secret" (within its meaning above). The contentions asserted in Chapter C(2) above also prove that Mr. Shelmerdine will inevitably use the Confidential Information or the trade secrets of the Company during his employment by SentinelOne, in a manner that gives rise to the tort of "misappropriation of a trade secret" as stated in the Commercial Torts Law.

78. Solely for the sake of caution it should be noted that even if the Honorable Court asserted that Mr. Shelmerdine does not have a trade secret of the Company, then the courts have already ruled, and more than once, that even the use of information that is not considered as a "trade secret" but that constitutes "confidential information" of the employer, can be considered as breach of fiduciary duties and the duty of good faith. This holds true per a fortiori when dealing with a senior employee who is subject to enhanced duties of good faith[8].

## E(3)   Breach of fiduciary duties and bad faith

79. Over the years the different courts elaborated on fiduciary duties and the duty of good faith of the employee towards his employer in general and the protection of confidential information in particular. This issue gains further importance when dealing with such a senior employee, whose fiduciary duties and the duty of good faith towards the Company are enhanced duties.

80. In that manner, for example, in the **Yavin Plast** Case the Supreme Court dismissed the main part of a motion for leave to appeal on the decision of the National Labor Court and asserted that it was necessary to leave unchanged the decision to enforce the non-compete clause for a period of two years as of termination of employer-employee relationship. The Supreme Court stated the following:

> "An employee is subject to an obligation that stems from the relationship of trust between the employee and his employer, and that is set out in the contract that the employee made with his employer, and the need to perform

---

[8] See, for example, LA 2912-11-10 **Menachem Man v. Sapir Sprint Ltd.**, (Nevo, 14/11/11).

this contract in good faith, to protect the trade secrets of the employer, not to use such secrets for his benefit or for the benefit of another, and not to disclose them, however only after obtaining the permission of the employer. <u>This duty is imposed on the employee during the time the employer-employee relationship is in effect and even after termination thereof, and it will expire only when the trade secret ceases to be a secret not following the employee's initiative. The existence of this obligation is not conditional on the performance of an express provision in an employer contract</u>[9].

81.  As stated in Chapter C(2) above, the Company proved that Mr. Shelmerdine will inevitably use the Confidential Information of the Company during his employment in SentinelOne, and that there are reasonable grounds to assume that this is also the purpose of Mr. Shelmerdine's employment in SentinelOne. In light of the fact that Mr. Shelmerdine has a critical mass of Confidential Information that is relevant for the upcoming years, and first and foremost information relating to the Revolutionary Development, then the enforcement of the non-compete clause for a period of 12 months, and with respect to competitors in the sphere of activity of the Company, is admittedly reasonable.

82.  We can learn about the extreme bad faith conduct of Mr. Shelmerdine from the circumstances described in Chapter C(2) in section 57 above and the additional circumstances to which we shall refer hereunder.

83.  And so, the direct and immediate transition to one of the two major competitors of the Company only highlights the unfair nature of the actions of Mr. Shelmerdine and constitutes breach of the enhanced fiduciary duty in employer-employee relationships[10].

84.  As said, the Company made an offer to Mr. Shelmerdine to find work during a period in which the Company would incur his employment costs, but Mr. Shelmerdine refused to this offer without any reasonable explanation. For the purpose of this matter we shall remind that Mr. Shelmerdine resigned from his office in the Company <u>and from such a position he could take all the time to find work in a company that want sent in competition with the Company</u>.

---

[9] HCJ 1683/93 *Yavin Plast v. National Labor Court in Jerusalem et Ors.*, 47(4) 702, 707-708.
[10] See the Trendline Case.

85.    We may assume, with high probability, that the negotiations that Mr. Shelmerdine conducted with SentinelOne, behind the back of the Company, continued for a long time, during which Mr. Shelmerdine continued to be exposed, on a daily basis, to the most confidential trade secrets of the Company, and the Revolutionary Development, and while knowing that he would use these secrets in a very short time in his new work. This is a conduct that was recognized in legal precedents as bad faith conduct by the employee, and the statements that were made in the **ExciteAd Case** are relevant for the purpose of this matter:

> "The Respondent conducted in bad faith from the time he started his recruit procedures in a competing company during the term of his employment in the Applicant and during the advance notice period, from the time the Respondent signed a Non-Disclosure and Non-Compete Agreement, without informing his managers. We found that the Respondent updated his direct superior, a few days prior to the termination of his employment in the Applicant, from the time he agreed to become an employee of the competing company even before he resigned."[11]

86.    Mr. Shelmerdine's conduct as stated above is a gross violation of fiduciary duties, the duty of fairness and good faith, in a manner that causes actual harm to the Company and its business operations. Legal precedents stated for the purpose of this matter that the public policy was not to turn the employee into a "trojan horse" in the premises of his employer so that the employee would be able to gain from this employment, and the statements that were made in the **Girit Case**, where the National Labor Court ordered the issuance of an injunction that prohibited a former senior employee who was involved in the development of the product technology to engage and/or solicit a client of the Company, as follows:

> "We should assign proper weight to considerations relating to trust, fairness, good faith and fair trade. The breach of these duties by the Respondents constitutes actual harm to the public interest and the public policy and these must not be allowed. This is because the public policy does not aim to turn the employee into a "trojan horse" in the premises of his employer and that the employee would gain from such employment. This is particularly true when taking into

---

[11] LDHJ (Tel Aviv) 17930-10-16 *ExciteAd Digital Marketing Ltd. v. Eyal Aragon*.

account the fact that there were holders of senior executive positions in the Company and especially in a field designated for the commercial relationships with Krona."[12]

### E(4).  **The special consideration that Mr. Shelmerdine received for his non-compete undertaking also justifies the enforcement of the non-compete clause**

87.  As said, Mr. Shelmerdine received a high salary in return for his non-compete and non-disclosure undertakings, both compared to the employment market Mr. Shelmerdine is in and compared to his peers and other managers at work, and all as stated in Chapter C(2) above (section 57(g)).

88.  Beyond the said consideration, Mr. Shelmerdine also received, by virtue of the compensation plan of the Company, options to purchase the shares of the Company in August 2017 and in October 2018, and all in direct relationship to the fact that upon expiration of his employment he would not work for a competing company (since in such circumstances the Company is entitled to deny from him the options).

89.  Section 5 of the options plan of the Company states the following:

"(c) **Termination**. Any portion of a Stock Option that is not vested and exercisable on the date of termination of an optionee's Service Relationship shall immediately expire and be null and void. Once any portion of the Stock Option becomes vested and exercisable, the optionee's right to exercise such portion of the Stock Option (or the optionee's representatives and legatees as applicable) in the event of a termination of the optionee's Service Relationship shall continue until the earliest of: (i) the date which is: (A) 12 months following the date on which the optionee's Service Relationship terminates due to death or Disability (or such longer period of time as determined by the Committee and set forth in the applicable Award Agreement), or (B) three months following the date on which the optionee's Service Relationship terminates if the termination is due to any reason other than death or Disability (or such longer period of time as determined by the Committee and set forth in the applicable Award Agreement), or (ii) the Expiration Date set forth in the Award Agreement; **provided that notwithstanding the foregoing, an Award Agreement may provide that if the optionee's Service Relationship is terminated for Cause, the Stock Option shall terminate immediately and be null and**

---

[12] LA 189/03 *Girit Ltd v. Mordechai Aviv et Ors.* (Nevo, 18/12/2003); LA 62/08 *David Label v. DAKA90 Company*, (Nevo, 27/12/2009); LA 2912-11-10 *Menachem Man v. Sapir Sprint Ltd.* (Nevo, 14/11/2011); Trendline Case.

**void upon the date of the optionee's termination and shall not thereafter be exercisable**."

The options plan states expressly the definition of a "Cause" as follows:

> ""Cause" shall have the meaning as set forth in the Award Agreement(s). In the case that any Award Agreement does not contain a definition of "Cause," it shall mean (i)... ; **or (v) the grantee's material violation of any provision of any agreement(s) between the grantee and the Company relating to noncompetition, nonsolicitation, nondisclosure and/or assignment of inventions.**"

➤ A copy of the relevant pages from the options plan of the Company is attached to the Motion and marked as **Appendix 10**.

90. Given these circumstances, and to the extent that the transition of Mr. Shelmerdine to SentinelOne is not prevented, then the Company intends to deny from Mr. Shelmerdine the exercising of the options that vested on the termination date of his employment, in the amount of tens of thousands of dollars that constitute proper consideration and even way beyond with respect to the non-compete undertaking of Mr. Shelmerdine as stated in the Employment Contract. The Company is expected to send a proper notice to the escrow agent in the upcoming days.

91. In addition, on the date the employment termination notice was delivered the Company offered Mr. Shelmerdine an additional special consideration in the amount of approximately NIS 240,000 i.e. the Company will pay to the employee 4 additional salaries and during this period the Company will assist Mr. Shelmerdine to find work in a company that is not in competition with the Company.

92. **In the Playtika Case the Honorable Court stated that the offer that was made by the Company to pay additional salaries for part of the restriction period constituted special consideration justifying the enforcement of the non-compete clause[13]. It should be noted that a motion for leave to appeal that was filed with the National Labor Court with respect to this decision was dismissed, and therefore the generous offer that was made by the Company is sufficient for the purpose of enforcing the non-compete clause on Mr. Shelmerdine for a period that will assure the protection of its trade secrets.**

---

[13] Sections 11 and 16 of the judgment.

93.   In light of the foregoing, even in light of the entire considerations specified above the Honorable Court should order the enforcement of the non-compete clause in Mr. Shelmerdine's Employment Contract with the Company.

## F.   The balance of convenience clearly leans in favor of the Company and the Company should obtain the reliefs sought in the first part of this Motion

94.   When coming to decide whether or not to grant a motion for a temporary relief, the court will consider the "balance of convenience" between the damage caused to the Company if the Company does not obtain the urgent reliefs it requested, and the damage of Mr. Shelmerdine if the injunctions are issued[14].

95.   The Company will argue that  the facts described above suffice for the purpose of granting the interim and temporary reliefs requested in the first part of this Motion. However, as said, to the extent that the Honorable Court is of the opinion that the payment of Mr. Shelmerdine's salary is sufficient until otherwise decided for the purpose of granting the temporary relief, then the Company will be willing to act in the said manner. This state of affairs will strike a proper balance between the interests of both parties until the court decides in the temporary relief. On the one hand, the protection of the confidential information of the Company will be guaranteed, while on the other hand the occupation or the regular income of Mr. Shelmerdine will not be affected.

96.   As said, the Revolutionary Development has cardinal importance for the Company and, likewise, to any of its competitors, including SentinelOne (for further details see Chapter C(1) above) and it is clear that the financial ramifications of the breach of the certain undertaking of Mr. Shelmerdine is estimated in the amount of  tens millions of dollars and even way beyond, and it is clear that the Company will not be able to recover such amounts from a private person. Likewise, even the knowledge of the vulnerabilities of the major competitor in the areas of technology, marketing and sales constitutes an enormous and unfair advantage that will affect the ability of the Company to compete equally with SentinelOne and cause the loss of immense investments and thousands of hours of work by hundreds of employees and cause enormous and even irreversible damage to the Company.

97.    Given the circumstances of this case, then the limitation on the occupation of Mr. Shelmerdine for a period of 12 months is reasonable.

---

[14] LDHJ (Tel Aviv) 60863-11-18 **Ofakim General Insurance Agency Ltd. v. Tzvia Tavor**, (Nevo, 11.12.2018).

98.   At the same time, Mr. Shelmerdine will not suffer any damage and his freedom of occupation will not be impaired since he can easily find a job that matches his skills, not in SentinelOne, and he will not use the trade secrets of the Company.

99.   The Company knows that Mr. Shelmerdine did not yet commence his employment in SentinelOne, and therefore it is still not late and it is possible to prevent the serious consequences of the commencement of Mr. Shelmerdine's employment in SentinelOne.

100.  The Company approaches the Honorable Court with clean hands and in good faith for the purpose of enforcing the obligations of Mr. Shelmerdine towards the Company, by virtue of his contractual and other undertakings towards the Company, and this is yet another reason why the Company is entitled to the reliefs set out in the first part of this Motion.

## G.   Conclusion

101.  In light of the foregoing, per a fortiori in light of the cumulative weight of the contentions asserted in this Motion, the Honorable Court is requested to grant the reliefs set out in the first part of this Motion.

102.  In addition, the Honorable Court is requested to compel the employee to pay the expenses of the Company for the filing of this Motion, in addition to attorney fees and statutory VAT in respect whereof.

103.  This Motion is supported by the affidavit of Mr. Ori Herman, CEO of the Company in Israel.

<br>

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Rami Landa, Adv. | Hedvat Yanko Wollman, Adv. | Hadas Zigdon, Adv. |
| License No. 13269 | License No. 41423 | License No. 76735 |

**Meitar Liquornik Geva Leshem Tal, & Co. Advocates**
Counsels for the Company

<br>

Ramat Gan, April 19, 2020.

# EXHIBIT B-1

**In the Regional Labor Court**
**Of Tel Aviv - Yafo (Bat Yam)**

LDHJ 17670-04-20

<u>Before Honorable Judge Idit Itzkovitz</u>

**In the matter of:**

1.   **Cybereason Labs Ltd., Company Reg. No.**
     **514804251**
2.   **Cybereason Inc., 5186652, Delaware**

By their counsels Rami Landa and/or Hedvat Yanko
Wollman and/or Hadas Zigdon and/or et Ors.
Meitar Liquornik Geva Leshem Tal, & Co.
Advocates
Of 16 Abba Hillel Silver Rd., Ramat Gan 5250608;
Tel.: 03-6103100; Fax: 03-6103111

**The Applicants**;

-Versus-

**Yonatan (Yonni) Yossef Shelmerdine, ID. No.**
**209609676**
**3 270 St. (apt. 609), Cambridge (Massachusetts),**
**United States**
By his counsels Nehushtan Zafran Scharf Jaffe &
Co.
12 Abba Hillel Silver St., Ramat Gan – "Sasson
Hugi" Tower
Tel.: 03- 6134401; Fax: 03- 6134402

**The Respondent**;

# <u>Urgent motion for an interim injunction in light of a material change of circumstances</u>

The Honorable Court is hereby requested by the Applicants, Cybereason Labs and
Cybereason Inc. (hereinafter collectively: the **"Company"**) to reconsider its decision dated
April 20, 2020, in light of a material change of circumstances, and issue the interim
injunction prohibiting the Respondent, Mr. Yonatan Yossef Shelmerdine (**"Mr.
Shelmerdine"**) to work in the competing company – SentinelOne (the **"Competing
Company"**) as stated in the first part of section 1 of the Motion for Interim and Temporary
Reliefs (the **"Motion for Interim Reliefs"**) for the following reasons:

A.  The findings of the <u>initial</u> forensic analysis report of a computer expert from the United States dated April 25, 2020;

B.  The materials attached in a sealed envelope and solely for the inspection of the Honorable Court;

C.  The information that the undersigned received from the counsel of Mr. Shelmerdine, namely that Mr. Shelmerdine has already started to work for the Competing Company.

**<u>The following are the reasons for the Motion</u>**:

<u>The forensic analysis – initial review of Mr. Shelmerdine's laptop</u>

1.  Within the framework of Mr. Shelmerdine's work in the Company the Company provided to Mr. Shelmerdine a laptop, and upon termination of employer-employee relationship between the parties on April 10, 2020 Mr. Shelmerdine was required to return the laptop to the Company. Mr. Shelmerdine returned the laptop to the Company on April 16, 2020.

2.  In light of the actual suspicion that Mr. Shelmerdine took unlawfully confidential documents of the Company, his laptop was delivered for an analysis conducted by "Consilio – Global leader in legal consulting & legal services" ("**Consilio Company**") – a company specializing in the analysis and review of computer systems and whose place of residence in the United States.

3.  **Yesterday, on April 25, 2020, the initial forensic analysis findings were received, from which it was found that there was a deliberate, malicious and premeditated attempt to conceal and suppress evidence by the full and total deletion of the entire materials that were kept in Mr. Shelmerdine's laptop, and all for the purpose of preventing any option by the Company to track the essence of the confidential information that Mr. Shelmerdine took unlawfully from the Company, and the scope of such information (the "Analysis Report").**

    ➤  A copy of the Forensic Analysis Report prepared by Consilio Company is attached to the Motion and marked as **Appendix 1**.

4.  The findings of the forensic analysis add to the many solid reasons that are stated in chapter C of the Motion for the Interim Reliefs and that also prove that even within the framework of Mr. Shelmerdine's work in the Competing Company, to the extent

that such work is not prevented by the Honorable Court, Mr. Shelmerdine will disclose the confidential information of the Company.

5.   The following emerged from the Forensic Analysis Report:

(a)   On April 5, 2020 (approximately five days after Mr. Shelmerdine announced his resignation from the Company) at 5:18:17 (UTC) a USB device of the type Kingston Data Traveler 100 was connected to Mr. Shelmerdine's laptop, a device that is not part of the equipment provided by the Company (the "**USB Device**"). The Company will request, *inter alia*, to analyze this device within the framework of the documents' discovery that the Company intends to commence against Mr. Shelmerdine in the United States and for the purpose of supporting the litigation conducted in Israel.

(b)   On the same day, at 15:19:19 (UTC) and approximately one minute after the USB Device was connected to the computer, a software product by the name of "CleanMyMac" started to operate **under the name "Eunice**." This is a special software product designated for destroying the data kept on the computer, removing applications, files and other data, **when the user can define which files should be removed**.

It is clarified that the software is marketed as a means for eliminating the traces of any activity that was performed in the computer in a manner that is not recoverable.

(c)   The "CleanMyMac" software has a unique feature by the name of "Shredder" – that should be added and set in particular – and whose purpose is to **delete permanently** data in a more secure manner and for the purpose preventing the recovery of the files by using the customary tools, if any. The "Shredder" includes another feature by the name of "Uninstaller" that also enables the removal of the entire files from the computer.

(d)   590 files were removed from Mr. Shelmerdine's laptop over a period of approximately 30 minutes, by the use of the "Shredder," in addition to 51 files that were removed by the "Uninstaller" which proves that Mr. Shelmerdine had full control over the deletion process.

6.   **A translation of the Analysis Report will be submitted to the Honorable Court at the earliest opportunity after its completion**.

7.  The findings of the forensic analysis, and first and foremost the deletion of the entire information that was stored in Mr. Shelmerdine's laptop in general and by a designated "aggressive" and anti-forensic software that was intended to impede the recovery and the tracing of such information in particular is an extraordinary and serious act that not only speaks for itself, but is also in contravention of a series of undertakings made by Mr. Shelmerdine in his employment contract and the guidelines of the Company to its employees, and as stated hereunder:

(a)  In his employment contract Mr. Shelmerdine undertook, in section 9.4.2, to return to the Company immediately and upon the termination of his employment all documents, property, equipment or any other materials he had access to during the term of his employment.

Section 14 of the employment contract further states that Mr. Shelmerdine received a laptop that he would use solely for his work purposes and subject to his undertakings in accordance with the agreement (and that also includes an undertaking of confidentiality and non-competition).

In addition, the said section 14 states that any information or documents that were received or sent, *inter alia*, via computer, are the exclusive property of the Company.

➤  A copy of Mr. Shelmerdine's employment contract is attached to the Motion and marked as **Appendix 2**.

(b)  In addition to the provisions set forth in the employment contract as said, even the procedures of the Company set out this obligation explicitly. The procedures book of the Company, that is published in a company intranet website operated by the Company and that is known by all the employees in the Company who are obligated to read these procedures prior to the commencement of their employment in the Company, states the following explicitly in section 9:

> *"However, at all times, equipment assigned to an employee remains the property of the company and is subject to reassignment and/or use by the Company without prior notice or approval from the employee. This <u>includes but is not limited to computer equipment and data stored thereon, voicemail, records and employee files.</u> "*

> ➤ A copy of the relevant pages from the procedures book of the Company is attached to the Motion and marked as **Appendix 3**.

8. **For the purpose of providing a full account it is clarified that following an inspection that the Company conducted regarding the manner of return of Mr. Shelmerdine's laptop in Israel, and prior to his relocation to the United States, it was found that his computer was returned without containing any deletions**.

> ➤ A copy of the email on behalf of the computer department of the Company is attached to the Motion and marked as **Appendix 4**.

9. The National Labor Court considered the severity of the acts of copying and deleting **in the case of Dr. Shlomo Cohen**, while stating that this was a serious breach of fiduciary duties and extreme bad faith, based on which the court ordered the issuance of the requested injunctions:

> "Shortly before they left the office, the Respondents copied and deleted from their computers in the office different files relating to the customers of the office. In light of the said, the court reached the conclusion that the conduct of the Respondents amounts to breach of the enhanced fiduciary duty imposed on them within the framework of employer-employee relationship with the office and amounts to extreme bad faith. The breach of these duties, as asserted by the Regional Labor Court, can justify the imposition of limitations on the occupation of the Respondents."[1]

10. For the purpose of this matter it is clarified that even the Honorable Court took into consideration, implicitly, that fact that there is clear importance to the question whether Mr. Shelmerdine took documents and confidential information of the Company. We can reach this conclusion, *inter alia*, based on the fact that within the framework of the decision of the Honorable Court dated April 19, 2020 the Company was required to provide further information about the confidential information that was misappropriated from it.

11. In light of the said, the Honorable Court is requested to issue an interim injunction as requested in section 1 of the Motion for Temporary Reliefs, when the Company is

---

[1] LA (National) 32379-09-16 *Dr. Shlomo Cohen & Co. – Law Office – Amira Menglus*, (published in Nevo, 21.08.2017).

of the opinion that the findings of the forensic analysis suffice for the purpose of granting the Motion. Nevertheless, the Company is of the opinion that even an inspection of the presentation that Mr. Shelmerdine prepared further affirms the need to issue the interim injunction, as stated hereunder.

The presentation that Mr. Shelmerdine prepared regarding the revolutionary development leaves no room for doubt regarding its importance to the Competing Company

12.  As stated in Chapter C(1) in the Motion for Temporary Reliefs, the confidential information held by Mr. Shelmerdine concerns three major areas including, *inter alia*, the future plans of the Company, and first and foremost the revolutionary development.

13.  As stated in the Motion for Temporary Reliefs, one of the most sensitive and confidential secrets of the Company is its future plans, and in particular the said revolutionary development on which the Company worked in the past two years and **that is expected to produce it a significant and unprecedented advantage over its competitors**.

14.  In light of the importance of the said revolutionary development, the Company allowed to a very small team of developers to engage in this development for reasons relating to confidentiality and for the purpose of preserving its advantage over its competitors.

15.  Mr. Shelmerdine was part of the said small group of executives who were involved in the revolutionary development and in this framework Mr. Shelmerdine was thoroughly familiar with the revolutionary development, supervised it closely and updated the member of management in the progress that was made in the development and its commercialization options.

16.  We can reach this necessary conclusion from a detailed presentation that Mr. Shelmerdine prepared in connection with the revolutionary development that he presented to the CEO of the Company and to another very small group of managers on December 9, 2019.

17.  The presentation that Mr. Shelmerdine prepared and that also included notes explaining the content of each of the slides – in a manner that proves the existence, confidentiality and importance of the revolutionary development for the Company in

general and over its competitors in particular, **when Mr. Shelmerdine also holds the same view**[2].

18. **The Company is aware that the panel of judges might not be in the court at the time of filing the motion by the electronic records ("Net Hamishpat") system and therefore the Company is willing to deliver the sealed envelope to any address as may be required and the Company will wait for the decision of the Honorable Court for the purpose of this matter.**

   **In light of the clear sensitivity of the materials as stated in the presentation, the Honorable Court is requested to return to the Company the materials contained in the sealed envelope and the said material will be presented to the Honorable Court in a later stage, whenever necessary**.

19. Despite the detailed explanations that appear in each of the slides in the presentation, the Company wishes to stress the following points:

   (1)   This presentation was presented to the CEO of the Company and to a limited number of VPs of technology, product development and members of management on December 9, 2019 as said.

   (2)   The presentation contains an analysis of the impact of the revolutionary development on the Company and the cyber market, in many aspects.

   (3)   The presentation describes the development, the fact that the development is not held by any other company, and an explanation about the revolutionary nature of the development.

   (4)   **The Honorable Court is referred to slide 6 in the presentation from which we can learn about the position of Mr. Shelmerdine regarding the unique properties and capabilities of the secret technology that was developed. In this slide, that Mr. Shelmerdine prepared, Mr. Shelmerdine notes that in his opinion the revolutionary development is expected to be a game-changer in the competition in this field**.

   (5)   The presentation includes a technological survey and a detailed explanation regarding the manner that the revolutionary development

---

[2] It should be noted that part of the confidential information was deleted from the presentation itself for the purpose of delivering it to the Honorable Court. The word "REDACTED" will be written on the deleted information. Nevertheless, this shall not diminish or derogate from the clear impression that emerges from this presentation.

provides to the Company a dramatic advantage over its competitors (and in particular in slides 9-11).

20. **In light of the nature of the information as said, there is no real possibility that Mr. Shelmerdine will keep in confidence a secret that in one year will put the company in which he intends to work in a substantially inferior position compared to the Company**.

21. The Honorable Court is referred to the **Playtika Case**[3] and to the **DSP GROUP INC**[4] Case for the purpose of this matter.

22. It would be just and equitable to grant this Motion.


_____                    _____
[Signed]                                                           [Signed]
**Hedvat Yanko Wollman, Adv.**                    **Hadas Zigdon, Adv.**

**Meitar Liquornik Geva Leshem Tal, & Co. Advocates**
**Counsels for the Company**


April 26, 2020.

---

[3] LDHJ 2433-03-17 ***Playtika Ltd. v. Yaakov Gmar***, (19/3/2017).
[4] CA 294/97 ***DSP Group Inc. v. I.C.Com Ltd.***, DCR 1997(31) (24/7/1997).

# EXHIBIT B-2



# *Forensic Analysis: Initial Review*

Cybereason | Apple Macbook Pro

April 25, 2020

# Executive Summary

On April 20, 2020, an Apple Macbook Pro laptop computer ("the Laptop") belonging to Cybereason ("the Company") was forensically imaged. We undertook an initial analysis of the laptop and, as a result, note the following:

a)   On April 5, 2020 at 05:18:17 (UTC), a Kingston DataTraveler 100 G3/G4/SE9 G2 USB device was attached to the Laptop.

b)   On April 5, 2020 at 5:19:19 (UTC), one minute after the Kingston USB device connection, the application named "CleanMyMac" was run on the Laptop under the user profile "yonnis".  This process removed data, including files under the "yonnis" user profile, from the computer.

c)   CleanMyMac is an affordable, data destruction tool commercially available to the public. It is used to remove unwanted data from an Apple computer by uninstalling programs and deleting large or old files. Users can specify which data to remove.

d)   The "Shredder" feature is a module of CleanMyMac that allows a user to securely delete data in a manner that is unrecoverable by any specialized tools.  Per the software developer's documentation, Shedder's "secure removal" option "Deletes items so that they cannot be recovered with any special tools. This type of removal takes more time, but all data gets rewritten, which leaves no chance to recover."

e)   Over the course of approximately 30 minutes, CleanMyMac removed 590 files via the Shredder feature, and 51 files via the Uninstalled feature.

f)   The files removed via Shredder originated from a folder named "untitled folder" on the Desktop of the user profile "yonnis".

# Evidence

On April 20, 2020, we obtained a forensic image of a laptop computer system identified in Table 1 below:

| Manufacturer | Apple |
|---|---|
| Model Number | MacBook Pro / A1989 |
| Serial Number | C02XW08NJHD5 |
| Capacity | 512 GB |

*Table 1: Device Information for Analyzed Laptop*

# Procedure

On April 15, 2020, we, Consilio, were retained by Goodwin Proctor to obtain a forensic image of laptop computer located at 614 East 3rd St. #2, Boston, MA 02127, in the possession of Kelsey Mariano, Talent Manager. The device was shipped to Consilio via FedEx (tracking number: 770261110945) on April 17, 2020.

On April 20, 2020, an Apple Macbook Pro laptop ("the Laptop") was received by Senior Forensic Examiner Justin Pynes, of Consilio's Data Forensics and Expert Services department ("DFES"). The Laptop was photographed (attached at EXHIBIT A), and chain of custody documentation was subsequently completed (attached at EXHIBIT B).

We note that when the Laptop arrived it was powered on and the battery level was at approximately 10%. As a result, we powered down the Laptop in order to obtain a forensic image. We obtained this image using Macquisition 2020 r1 ("Macquisition"). A forensic image is a bit-for-bit copy of the storage device contained within the laptop and is an exact copy of the data contained on it. We obtained an image of the laptops' storage device in two different formats and stored those images on a Seagate Expansion Portable external hard drive, serial number NAA5CMX4, and labeled with a Consilio internal identifier "PHX00080" ("destination drive").

Each forensic image was verified as accurate by comparing the image file hash values to the source hard drive hash values, and we note that the image files contained an exact duplicate of the data contained on the original storage device. We also created a backup of the forensic images we obtained on a second Seagate Expansion Portable external hard drive, serial number NAA5AK2Y, and labeled with a Consilio internal identifier "PHX00081" ("backup drive") for redundancy purposes. Our analysis was undertaken using the forensic images stored on this external drive.

The backup drive was shipped to Consilio's evidence storage facility located in our Chicago office at 550 W Van Buren St Suite #1600, Chicago, IL 60607 on April 21, 2020 via FedEx (tracking number: 7702 7988 6263) and it arrived on April 22, 2020.

The analysis of the forensic image was conducted by Candice Wendt, a Senior Manager of DFES, and commenced on April 22, 2020 after the hard drive containing a backup of the data's arrived at our evidence storage facility in Chicago.

# Examination

The following software was utilized during the analysis of the Laptop:

- Blacklight, v2019.3
- EnCase Forensic, v8.11
- Notepad++, v7.8.5
- plistEditor Pro v2.5

# System Information

We note the following with respect to the operating system installed on the Laptop computer system:

| MacOS Version | 10.14 (Mojave) |
|---|---|
| Time Zone | Asia/Jerusalem |

*Table 2: System Information of the Laptop*

The Laptop was set to the Asia/Jerusalem time zone at the time of imaging.

# User Profiles

As a result of our analysis, we identified three (3) non-system profiles on the Laptop:

- cyberadmin
- yonnis
- yonnis (Deleted)

User profiles are used by the MacOS operating system to assist users in managing their data and settings by segregating information, such as documents, into areas for that user only.

The unique ID assigned to the "yonnis" account is: 50865361.

As identified above, there is a deleted user profile for "yonnis". Our analysis indicates that the profile was deleted on April 17, 2019, close to a system update. As a result of the time elapsed between the date that this profile was deleted and the date of our analysis, our analysis focuses on activity under the non-deleted user profile, "yonnis".

# USB Device Activity

The Unified Logs[1] were analyzed to determine if any USB storage devices were attached to the Laptop. When a USB device is attached to the system, a log entry is generated in the Unified Logs, which can contain the product manufacturer and model of the device as well as the date and time that the device was connected to the computer.

As a result of our analysis, we note that a Kingston DataTraveler 100 G3/G4/SE9 G2 USB device was attached to the Laptop on April 5, 2020 at 05:18:17 (UTC).

| Date | Message |
|---|---|
| 2020-04-05 05:18:17.948378 (UTC) | USBMSC Identifier (non-unique): 60A44C3FAF75BF51C994002C 0x951 0x1666 0x100, 3 |

*Table 3: The log entry of the Kingston USB device found within the Unified Logs*

---

[1] Unified Logging is a logging feature of macOS released in version 10.12 that stores activity logs in a centralized location on a MacOS device.

In the table above, "USBMC (non-unique)" is a standard log entry used in the Unified Logs to indicate that a USB device has been connected to the system. The log entry contains an internal identification number ("ID"), manufacturer ID, product ID, and a version number, the latter three being in hexadecimal format.

## CleanMyMac

As a result of our analysis, we note that the application named "CleanMyMac" was run on the Laptop on April 5, 2020 at 5:19:19 (UTC), under the user profile "yonnis".

CleanMyMac[2] is developed by Macpaw, a software company based in the Ukraine. CleanMyMac is designed to facilitate the process of data destruction, removing applications, files, malware, and other unwanted data from MacOS computers. One feature of CleanMyMac is the "Shredder feature, which allows users to permanently delete specific data. Per Macpaw's documentation, Shedder's "secure removal" option "Deletes items so that they cannot be recovered with any special tools. This type of removal takes more time, but all data gets rewritten, which leaves no chance to recover."[3]

In addition to the "Shredder" feature, CleanMyMac also includes an "Uninstaller" feature, which enables a user to uninstall a program and all of its files from the computer system.

CleanMyMac is commercially available and retails for approximately $40 USD for an annual subscription. The trial version is free to download, though use of the product is restricted compared to the licensed version, however we note that the Shredder feature is available to use in the trial version without restriction.[4]

The version of CleanMyMac that was installed on the Laptop was 4.6.1, which was released on March 25, 2020.[5]

As a result of our analysis, we reviewed a properties file ("plist") containing settings and properties for the CleanMyMac. Generally, a "plist" file is a settings file used on Apple operating systems used to store settings specific to application that reside on the computer. With respect to the CleanMyMac application, the "plist" contained the following information:

| File Name | com.macpaw.CleanMyMac4.plist |
|---|---|
| Location | /Users/yonnis/Library/Preferences/com.macpaw.CleanMyMac4.plist |
| Owner | 50865361 |
| MD5 Hash | E82FAA1EE6DA2A8BC386ED65CB8290E2 |

Table 4. Metadata of the CleanMyMac plist file

We note that the "plist" for the CleanMyMac application was located under the "yonnis" user account and listed that account as being the owner. This indicates that the software was used under the "yonnis" account.

Other properties or settings within the file indicate that the application was first launched on April 5, 2020 at 5:19:19 (UTC) and that the subscription was not active.

| First Launch Date | 2020-04-05 05:19:19 |
|---|---|
| SubscriptionCancelled | True |

Table 5: Properties in the CleanMyMac4.plist file

---

[2] https://macpaw.com/cleanmymac
[3] Source: https://macpaw.com/support/cleanmymac/knowledgebase/shredder
[4] Source: https://macpaw.com/support/cleanmymac/knowledgebase/trial
[5] Source: https://macpaw.com/cleanmymac/whats-new#4.6.1

As a result of our analysis, we also identified and reviewed the following log file pertaining to the CleanMyMac application:

| | |
|---|---|
| **File Name** | CleanMyMac X.log |
| **Location** | /Users/yonnis/Library/Logs/com.macpaw.CleanMyMac4/CleanMyMac X.log |
| **Date Created** | 2020-04-05 05:19:19 (UTC) |
| **Date Added** | 2020-04-05 05:19:19 (UTC) |
| **Owner** | 50865361 |
| **MD5 Hash** | E82FAA1EE6DA2A8BC386ED65CB8290E2 |

*Table 6: Metadata of a log file for CleanMyMac*

The create date and date added indicate that the log file was first created on April 5, 2020 at 5:19:19 (UTC), the same time it was first launched.

We note that the time stamps for log entries in the log file mentioned above start exactly four (4) hours behind the create date of the log create date. Given our knowledge and experience, the difference in the times is more than likely due to the following:

- Time zone settings on the computer
- The method CleanMyMac interprets time zone information
- How CleanMyMac records its log entries

Within the log file, there were 590 entries pertaining to files removed via the Shredder feature and 51 entries pertaining to files removed by the "Uninstaller" feature. Of note, the files removed via Shredder originated from a folder named "untitled folder" on the Desktop of the user profile "yonnis".

## Conclusion

The evidence analyzed for this initial examination indicated the following:

- On April 5, 2020 at 05:18:17 (UTC), a Kingston DataTraveler 100 G3/G4/SE9 G2 USB device was attached to the Laptop.
- The application named "CleanMyMac" was run on the Laptop on April 5, 2020 at 5:19:19 (UTC), under the user profile "yonnis".  This process removed data, including files under the "yonnis" user profile, from the computer.
- CleanMyMac is an affordable, data destruction tool commercially available to the public.  It is used to remove unwanted data from an Apple computer by uninstalling programs and deleting large or old files.  Users can specify which data to remove.
- The "Shredder" feature is a module of CleanMyMac that allows a user to securely delete data in a manner that is unrecoverable by any specialized tools.  Per the software developer's documentation, Shedder's "secure removal" option "Deletes items so that they cannot be recovered with any special tools. This type of removal takes more time, but all data gets rewritten, which leaves no chance to recover."
- Over the course of approximately 30 minutes, CleanMyMac removed 590 files via the Shredder feature, and 51 files via the Uninstalled feature.
- The files removed via Shredder originated from a folder named "untitled folder" on the Desktop of the user profile "yonnis".

We reserve the right to change any opinions formed in this report as additional details come into light.

*Candice Wendt*        4/25/2020
_____    _____
Candice Wendt            Date

# Glossary of Terms

| Term | Definition |
| --- | --- |
| Application (Computing) | A computer program |
| Blacklight | Software developed by Blackbag used to parse and analyze data from MacOS computers |
| Capacity | The amount of storage space on a specific device |
| Chain of Custody | Documentation that records the sequence of custody or transfer of electronic evidence |
| CleanMyMac | A software developed by Macpaw and is designed to facilitate the process of data destruction, removing applications, files, malware, and other unwanted data from MacOS computers |
| Collection (Forensic) | The process of preserving storage devices via forensic imaging |
| Date (Added) | A MacOS specific date in which the item was added to a folder |
| Date (Created) | The date which a file is created on the system |
| Date (Modified) | The last date which changes are made to a file |
| Deletion (File) | The process of removing data from a computer.  A user can delete files by moving them to the .Trash folder on a Mac computer or by using specialized tools to permanently remove them from the system. |
| File Name | The title or name of a file including its extension |
| Forensic Image | A bit-by-bit copy of a storage device, which includes all files, folders and unallocated, free and slack space. |
| Kingston DataTraveler | A USB storage device manufactured by Kingston.  It is connected to computer devices via the USB port. |
| Log File | A file on a computer that contains information about activity that occurred |
| MacOS | The standard name for operating systems run on Apple computers |
| Manufacturer | The company that produces a certain product |
| MD5 Hash | The result of an algorithm widely used to verify the integrity of data.  Two items with the same MD5 hash are duplicative. |
| Model Number | The identifier for a particular model of a product |
| Operating System | The core set of software that manages a computers hardware, software and resources.  Every standard computer must have an operating system in order to function.  Commonly known operating systems include Microsoft Windows (7, 8, 10), Mohave (MacOS 10.14), Catalina (MacOS 10.15), etc. |
| Owner | In computing, an owner is the user that owns the particular digital item |
| plist | Shortened name for "property file".  A file format used by computers running MacOS to store properties and settings for various applications |
| Properties (Computing) | Settings of an object on a computer |
| Seagate Expansion Portable | A external hard drive manufactured by Seagate |
| Serial Number | A unique identifier for a specific device |
| Shredder | A feature of CleanMyMac where a user can target specific files and folders for standard deletion or deletion in a manner that is unrecoverable. |
| Storage (Digital) | An area where data can be stored (i.e. a hard drive, USB thumb drive, etc.) |
| Unified Logs | A logging feature of macOS released in version 10.12 that stores activity logs in a centralized location on a MacOS device. |
| Uninstaller | A feature of CleanMyMac where a user can remove applications and all the associated program files from the system. |
| User (Computing) | An individual who uses or used the computer in question |
| User Profile (Computing) | An area where settings, information, and data is stored for a particular user on a computer. |
| UTC | Coordinated Universal Time time zone, the primary time standard which the world uses to regulate clocks and times, +0 offset |

# EXHIBIT A

Photographs of Laptop Computer and Packaging



# EXHIBIT B

Chain of custody documentation generated by Consilio for the Laptop Computer

**Consilio**

**Digital Evidence Lab**
**Chain of Custody**

| Engagement Number: | Engagement Name: | | Sheet Number: |
|---|---|---|---|
| H54030 | CyberReason | | 1 |

| Item | Item Description |
|---|---|
| 1) | MACbook Pro S/N CO2XWO8NJ5HD5 MODEL- A1989 |

| Item | Date/Time | From | To | Purpose |
|---|---|---|---|---|
| 1) | Date: 4-17-20 Time: | Name/Organization: Kelsey Mariano Signature: | Name/Organization: Justin Brief Consilio Signature: | TO IMAGE ONE MAC Book computer FedEx # 770261110945 |
| | Date: Time: | Name/Organization: Signature: | Name/Organization: Signature: | |
| | Date: Time: | Name/Organization: Signature: | Name/Organization: Signature: | |
| | Date: Time: | Name/Organization: Signature: | Name/Organization: Signature: | |
| | Date: Time: | Name/Organization: Signature: | Name/Organization: Signature: | |

Form 100 v1.0